E-FILED

AUG – 4 2009

Document # _____

1  DAVID J. VAN HAVERMAAT, Cal. Bar No. 175761
   Email: vanhavermaatd@sec.gov
2  LORRAINE B. ECHAVARRIA, Cal. Bar No. 191860
   Email: echavarrial@sec.gov
3  PARIS WYNN, Cal. Bar No. 224418
   Email: wynnp@sec.gov
4
   Attorneys for Plaintiff
5  Securities and Exchange Commission
   Rosalind R. Tyson, Regional Director
6  Michele Wein Layne, Associate Regional Director
   John M. McCoy III, Regional Trial Counsel
7  5670 Wilshire Boulevard, 11th Floor
   Los Angeles, California 90036
8  Telephone:  (323) 965-3998
   Facsimile:   (323) 965-3908
9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12  SECURITIES AND EXCHANGE        Case No. CV 09-2901 PSG (Ex)
    COMMISSION,
13                                 [PROPOSED] PRELIMINARY
                                   INJUNCTION AND ORDERS:
14          Plaintiff,             (1) FREEZING ASSETS;
                                   (2) APPOINTING A PERMANENT
15      vs.                        RECEIVER; (3) REPATRIATING
                                   ASSETS; (4) REQUIRING
16  PRIVATE EQUITY MANAGEMENT      ACCOUNTINGS;
    GROUP, LLC; PRIVATE EQUITY     (5) PROHIBITING THE
17  MANAGEMENT GROUP, INC.; and    DESTRUCTION OF
    DANNY PANG,                    DOCUMENTS; AND
18                                 (6) SURRENDERING THE
            Defendants.            PASSPORT OF DANNY PANG
19

20

21

22

23

24

25

26

27

28

1  This matter came to be heard upon Plaintiff Securities and Exchange
2  Commission's ("Commission") *Ex Parte* Application For A Temporary
3  Restraining Order and Orders: (1) Freezing Assets; (2) Appointing a Temporary
4  Receiver; (3) Repatriating Assets; (4) Requiring Accountings; (5) Prohibiting The
5  Destruction Of Documents; (6) Granting Expedited Discovery; (7) Surrendering
6  the Passport of Danny Pang; And Order To Show Cause Re Preliminary Injunction
7  And Appointment Of A Permanent Receiver (the "Application").  On April 27,
8  2009, the Court granted the Commission's Application and ordered the defendants
9  to show cause, if there be any, why a preliminary injunction should not be granted
10  and a permanent receiver appointed in accordance with the complaint filed by the
11  Commission.
12  The Court, having considered the Commission's Complaint, the Application,
13  the supporting Memoranda of Points and Authorities, Declarations and Exhibits,
14  and all other evidence and argument presented regarding the Application, finds
15  that:

16  A.  This Court has jurisdiction over the parties to, and the subject matter
17      of, this action.

18  B.  Good cause exists to believe that defendants Private Equity
19      Management Group, Inc., Private Equity Management Group, LLC
20      and Danny Pang (collectively, "Defendants"), and each of them, have
21      engaged in, are engaging in, and are about to engage in transactions,
22      acts, practices and courses of business that constitute violations of
23      Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15
24      U.S.C. § 77q(a); and Section 10(b) of the Securities Exchange Act of
25      1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5
26      thereunder, 17 C.F.R. § 240.10b-5.

27  C.  The Commission has demonstrated a probability of success on the
28      merits and the possibility of dissipation of assets.

1

1   D. Good cause exists to believe that Defendants will continue to engage

2     in such violations to the immediate and irreparable loss and damage to

3     investors and to the general public unless they are restrained and

4     enjoined.

5   E. Good cause exists to believe that Danny Pang may seek to leave the

6     United States in order to avoid responsibility for the fraudulent acts

7     alleged herein.

8            **I.**

9   IT IS HEREBY ORDERED that the Commission's Application For A

10 Preliminary Injunction and Orders: (1) Freezing Assets; (2) Appointing a

11 Permanent Receiver; (3) Repatriating Assets; (4) Requiring Accountings; (5)

12 Prohibiting The Destruction Of Documents; and (6) Surrendering the Passport of

13 Danny Pang is hereby GRANTED.

14            **II.**

15   IT IS FURTHER ORDERED that Defendants Private Equity Management

16 Group, Inc., Private Equity Management Group, LLC and Danny Pang, and their

17 officers, agents, servants, employees, attorneys, subsidiaries and affiliates, and

18 those persons in active concert or participation with any of them, who receive

19 actual notice of this Order, by personal service or otherwise, and each of them, be

20 and hereby are preliminarily restrained and enjoined from, directly or indirectly, in

21 the offer or sale of any securities, by the use of any means or instruments of

22 transportation or communication in interstate commerce or by use of the mails:

23   A. employing any device, scheme or artifice to defraud;

24   B. obtaining money or property by means of any untrue statement of a

25     material fact or any omission to state a material fact necessary in order

26     to make the statements made, in light of the circumstances under

27     which they were made, not misleading; or

28   C. engaging in any transaction, practice, or course of business which

1    operates or would operate as a fraud or deceit upon the purchaser

2  in violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

3                                  **III.**

4       IT IS FURTHER ORDERED that Defendants Private Equity Management

5  Group, Inc., Private Equity Management Group, LLC and Danny Pang and their

6  officers, agents, servants, employees, attorneys, subsidiaries and affiliates, and

7  those persons in active concert or participation with any of them who receive

8  actual notice of this Order, by personal service or otherwise, and each of them, be

9  and hereby are preliminarily restrained and enjoined from, directly or indirectly, in

10  connection with the purchase or sale of any security, by the use of any means or

11  instrumentality of interstate commerce, or of the mails, or of any facility of any

12  national securities exchange:

13       A.    employing any device, scheme, or artifice to defraud;

14       B.    making any untrue statement of a material fact or omitting to state a

15            material fact necessary in order to make the statements made, in the

16            light of the circumstances under which they were made, not

17            misleading; or

18       C.    engaging in any act, practice, or course of business which operates or

19            would operate as a fraud or deceit upon any person

20  in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule

21  10b-5 thereunder, 17 C.F.R. § 240.10b-5.

22                                  **IV.**

23       IT IS FURTHER ORDERED that, except as otherwise ordered by this Court,

24  Defendants Private Equity Management Group, Inc., Private Equity Management

25  Group, LLC and Danny Pang and their officers, agents, servants, employees,

26  attorneys, subsidiaries and affiliates, and those persons in active concert or

27  participation with any of them, who receive actual notice of this Order, by personal

28  service or otherwise, and each of them, be and hereby are preliminarily restrained

3

1    and enjoined from, directly or indirectly, transferring, assigning, selling,

2    hypothecating, changing, wasting, dissipating, converting, concealing,

3    encumbering, or otherwise disposing of, in any manner, any funds, assets,

4    securities, claims, or other real or personal property, including any notes or deeds of

5    trust or other interests in real property, wherever located and in whatever form such

6    assets may exist, of Private Equity Management Group, Inc., Private Equity

7    Management Group, LLC and Danny Pang, and their subsidiaries and affiliates,

8    whether owned by, controlled by, managed by or in the possession or custody of

9    any of them, and from transferring, encumbering, dissipating, incurring charges or

10    cash advances on any debit or credit card or the credit arrangement, of Private

11    Equity Management Group, Inc., Private Equity Management Group, LLC and

12    Danny Pang.

13    **V.**

14         IT IS FURTHER ORDERED that, except as otherwise ordered by this

15    Court, an immediate freeze shall be placed on all monies and assets in whatever

16    form such assets may exist and wherever located (with an allowance for necessary

17    and reasonable living expenses to be granted only upon good cause shown by

18    application to the Court with notice to and an opportunity for the Commission to

19    be heard) in all accounts at any bank, financial institution, brokerage firm, or

20    Internet or "e-currency" payment processor, all certificates of deposit, and other

21    funds or assets, such as personal or real property, held in the name of, for the

22    benefit of, or over which account authority is held by Defendants Private Equity

23    Management Group, Inc., Private Equity Management Group, LLC and Danny

24    Pang or any trust, partnership, joint venture, person or entity affiliated with them

25    (including subsidiaries), including but not limited to accounts at the following

26    institutions: (1) HSBC Bank; (2) East West Bank; (3) UBS Securities; and (4)

27    Bank of America.

28    ///

4

1                                              **VI.**

2          IT IS FURTHER ORDERED that Robert P. Mosier is appointed as

3  permanent receiver of Private Equity Management Group, Inc. and Private Equity

4  Management Group, LLC, and their subsidiaries and affiliates, with full powers of

5  an equity receiver, including, but not limited to, full power over all funds, assets,

6  collateral, premises (whether owned, leased, occupied, or otherwise controlled),

7  choses in action, books, records, papers and other real or personal property,

8  including notes, deeds of trust and other interests in real property, belonging to,

9  being managed by, or in the possession of or control of Private Equity

10  Management Group, Inc. and Private Equity Management Group, LLC, and any of

11  their subsidiaries and affiliates, and that such permanent receiver is immediately

12  authorized, empowered and directed:

13          A.      to have access to and to collect and take custody, control, possession,

14                  and charge of all funds, assets, collateral, premises (whether owned,

15                  leased, occupied, or otherwise controlled), choses in action, books,

16                  records, papers and other real or personal property, including notes,

17                  deeds of trust and other interests in real property, of Private Equity

18                  Management Group, Inc. and Private Equity Management Group,

19                  LLC and their subsidiaries and affiliates, with full power to sue,

20                  foreclose, marshal, sell, liquidate, collect, receive, and take into

21                  possession all such property;

22          B.      to have control of, and to be added as the sole authorized signatory for

23                  all accounts of Private Equity Management Group, Inc. and Private

24                  Equity Management Group, LLC and their subsidiaries and affiliates,

25                  including all accounts over which Private Equity Management Group,

26                  Inc. and Private Equity Management Group, LLC and any of their

27                  officers, employees or agents, have signatory authority, at any bank,

28                  title company, escrow agent, financial institution or brokerage firm

5

1   that has possession, custody or control of any assets or funds of

2   Private Equity Management Group, Inc. or Private Equity

3   Management Group, LLC, in whatever form such assets may exist and

4   wherever located, or which maintains accounts over which Private

5   Equity Management Group, Inc. or Private Equity Management

6   Group, LLC and/or any of their officers, employees or agents have

7   signatory authority;

8   C.   to conduct such investigation and discovery as may be necessary to

9   locate and account for all of the assets of, or managed by, Private

10   Equity Management Group, Inc. and Private Equity Management

11   Group, LLC and their affiliates, and to engage and employ attorneys,

12   accountants and other persons to assist in such investigation and

13   discovery;

14   D.   to take such action as is necessary and appropriate to preserve and

15   take control of and to prevent the dissipation, concealment, or

16   disposition of any assets of, or managed by, Private Equity

17   Management Group, Inc. or Private Equity Management Group, LLC

18   or their affiliates;

19   E.   to make an accounting, as soon as practicable, to this Court and the

20   Commission of the assets and financial condition of Private Equity

21   Management Group, Inc. and Private Equity Management Group,

22   LLC and the assets under their management, including all notes, deeds ·

23   of trust and other interests in real property, and to file the accounting

24   with the Court and deliver copies thereof to all parties;

25   F.   to make such payments and disbursements from the funds and assets

26   taken into custody, control, and possession or thereafter received by

27   him, and to incur, or authorize the making of such agreements as may

28   be necessary and advisable in discharging his duties as temporary

1            receiver;

2     G.      to employ attorneys, accountants, and others to investigate, advise

3            and, where appropriate, to institute, pursue, and prosecute all claims

4            and causes of action of whatever kind and nature which may now or

5            hereafter exist, including in state or federal courts, or in foreign

6            jurisdictions, as a result of the activities of present or past employees

7            or agents of Private Equity Management Group, Inc. and Private

8            Equity Management Group, LLC;

9     H.      to have access to and monitor all mail of Private Equity Management

10           Group, Inc. and Private Equity Management Group, LLC, in order to

11           review such mail which he deems relevant to the business of Private

12           Equity Management Group, Inc. and Private Equity Management

13           Group, LLC, and the discharging of his duties as temporary receiver,

14           and to make appropriate notification to the United States Postal

15           Service to forward delivery of any mail addressed to Private Equity

16           Management Group, Inc. and Private Equity Management Group,

17           LLC or to any of its subsidiaries or affiliates;

18     I.      to operate and control the content of information posted on Private

19           Equity Management Group, Inc. and Private Equity Management

20           Group, LLC Internet web sites;

21     J.      to seek discovery from parties and non-parties without regard to the

22           timing limitations set forth in Federal Rules of Civil Procedure

23           26(d)(1); and

24     K.      to exercise all of the lawful powers of Private Equity Management

25           Group, Inc. and Private Equity Management Group, LLC and their

26           officers, directors, employees, representatives, or persons who

27           exercise similar powers and perform similar duties.

28   ///

7

## VII.

IT IS FURTHER ORDERED that Defendants Private Equity Management Group, Inc., Private Equity Management Group, LLC and Danny Pang, and their officers, agents, servants, employees and attorneys, and any other persons who are in custody, possession or control of any assets, collateral, books, records, papers, notes, deeds of trust and other interests in real property, or other property of, or managed by, Defendants Private Equity Management Group, Inc., Private Equity Management Group, LLC and Danny Pang, shall forthwith give access to and control of such property to the permanent receiver.

## VIII.

IT IS FURTHER ORDERED that no officer, agent, servant, employee, or attorney of Defendants Private Equity Management Group, Inc., Private Equity Management Group, LLC and Danny Pang, or their subsidiaries or affiliates shall take any action or purport to take any action, in the name of or on behalf of Defendants Private Equity Management Group, Inc. or Private Equity Management Group, LLC or any of their subsidiaries and affiliates, including posting any information on any Internet websites that purports to be any communication on behalf of Defendants Private Equity Management Group, Inc., and Private Equity Management Group, LLC, without the written consent of the permanent receiver or order of this Court.

## IX.

IT IS FURTHER ORDERED that, except by leave of this Court, during the pendency of this receivership, all clients, investors, trust beneficiaries, note holders, creditors, claimants, lessors, and all other persons or entities seeking relief of any kind, in law or in equity, from Private Equity Management Group, Inc. or Private Equity Management Group, LLC, or their affiliates and subsidiaries, and all persons acting on behalf of any such investor, trust beneficiary, note holder, creditor, claimant, lessor, or other person, including sheriffs, marshals, servants,

1  agents, employees, and attorneys, are hereby preliminarily restrained and enjoined

2  from, directly or indirectly, with respect to Private Equity Management Group,

3  Inc., and Private Equity Management Group, LLC and their subsidiaries and

4  affiliates:

5      A.    commencing, prosecuting, continuing or enforcing any suit or

6             proceeding (other than the present action by the Commission) against

7             Private Equity Management Group, Inc. or Private Equity

8             Management Group, LLC or any of their subsidiaries and affiliates;

9      B.    using self-help or executing or issuing or causing the execution or

10            issuance of any court attachment, subpoena, replevin, execution or

11            other process for the purpose of impounding or taking possession of

12            or interfering with or creating or enforcing a lien upon any property or

13            property interests owned by or in the possession of Private Equity

14            Management Group, Inc. or Private Equity Management Group, LLC

15            or any of their subsidiaries or affiliates, wherever situated; and

16     C.    doing any act or thing whatsoever to interfere with taking control,

17            possession or management by the permanent receiver appointed

18            hereunder of the property and assets owned, controlled or in the

19            possession of Private Equity Management Group, Inc. or Private

20            Equity Management Group, LLC, or any of their subsidiaries or

21            affiliates, or in any way to interfere with or harass the permanent

22            receiver, or his attorneys, accountants, employees or agents or to

23            interfere in any manner with the discharge of the permanent receiver's

24            duties and responsibilities hereunder.

25                       **X.**

26     IT IS FURTHER ORDERED that Defendants Private Equity Management

27 Group, Inc., Private Equity Management Group, LLC and Danny Pang, and their

28 subsidiaries and affiliates and their officers, agents, servants, employees and

9

1  attorneys, shall cooperate with and assist the permanent receiver, his attorneys,

2  accountants, employees and agents, and shall take no action, directly or indirectly,

3  to hinder, obstruct, or otherwise interfere with the permanent receiver, his

4  attorneys, accountants, employees or agents in the course of the permanent

5  receiver's duties.  Defendants Private Equity Management Group, Inc., Private

6  Equity Management Group, LLC and Danny Pang, and their subsidiaries and

7  affiliates and their officers, agents, servants, employees and attorneys shall not

8  interfere in any manner, directly or indirectly, with the custody, possession,

9  management, or control by the permanent receiver of the funds, assets, collateral,

10  premises, and choses in action described above.

11                                                    **XI.**

12        IT IS FURTHER ORDERED that Defendants Private Equity Management

13  Group, Inc., Private Equity Management Group, LLC and Danny Pang shall pay

14  the costs, fees, and expenses of the permanent receiver incurred in connection with

15  the performance of his duties described in this Order, including the costs and

16  expenses of those persons who may be engaged or employed by the permanent

17  receiver to assist him in carrying out his duties and obligations.  All applications

18  for costs, fees and expenses for services rendered in connection with the permanent

19  receivership other than routine and necessary business expenses in conducting the

20  permanent receivership, such as salaries, rent and any and all other reasonable

21  operating and liquidating expenses, shall be made by application on at least a

22  quarterly basis setting forth in reasonable detail the nature of the services and shall

23  be heard by the Court.

24                                                    **XII.**

25        IT IS FURTHER ORDERED that no bond shall be required in connection

26  with the appointment of the permanent receiver.  Except for an act of gross

27  negligence, the permanent receiver shall not be liable for any loss or damage

28  incurred by any of the defendants, their officers, agents, servants, employees and

1   attorneys or any other person, by reason of any act performed or omitted to be
2   performed by the permanent receiver in connection with the discharge of his duties
3   and responsibilities.

4                                         **XIII.**

5          IT IS FURTHER ORDERED that representatives of the Commission are
6   authorized to have continuing access to inspect or copy any or all of the corporate
7   books and records and other documents of Defendants Private Equity Management
8   Group, Inc. and Private Equity Management Group, LLC and their subsidiaries and
9   affiliates and continuing access to inspect its funds, property, assets and collateral,
10  wherever located.

11                                        **XIV.**

12         IT IS FURTHER ORDERED that, except as otherwise ordered by this
13  Court, Defendants Private Equity Management Group, Inc., Private Equity
14  Management Group, LLC and Danny Pang, and their officers, agents, servants,
15  employees, attorneys, subsidiaries and affiliates, and those persons in active
16  concert or participation with any of them, who receive actual notice of this Order,
17  by personal service or otherwise, and each of them, be and hereby are preliminarily
18  restrained and enjoined from, directly or indirectly: destroying, mutilating,
19  concealing, transferring, altering, or otherwise disposing of, in any manner, any
20  documents, which includes all books, records, computer programs, computer files,
21  computer printouts, contracts, correspondence, memoranda, brochures, or any
22  other documents of any kind in their possession, custody or control, however
23  created, produced, or stored (manually, mechanically, electronically, or otherwise),
24  pertaining in any manner to Private Equity Management Group, Inc. and Private
25  Equity Management Group, LLC.

26                                        **XV.**

27         IT IS FURTHER ORDERED that Defendants Private Equity Management
28  Group, Inc., Private Equity Management Group, LLC and Danny Pang shall,

                                            11

1  within five days of the date of issuance of this Order, prepare and deliver to the

2  Commission a detailed and complete schedule of all assets of Private Equity

3  Management Group, Inc., Private Equity Management Group, LLC and Danny

4  Pang, including all real and personal property exceeding $5,000 in value, and all

5  bank, securities, futures, Internet payment processor, and other accounts identified

6  by institution, branch address and account number.  The accountings shall include

7  a description of the source(s) of all such assets.  Such accountings shall be filed

8  with the Court and copies shall be delivered to the attention of Paris Wynn at the

9  Commission's Los Angeles Regional Office located at 5670 Wilshire Boulevard,

10 11th Floor, Los Angeles, California 90036.  After completion of the accountings,

11 Private Equity Management Group, Inc., Private Equity Management Group, LLC

12 and Danny Pang shall produce to the Commission's Los Angeles Regional Office,

13 at a time agreeable to the Commission, all books, records and other documents

14 supporting or underlying the accountings.

15                                              **XVI.**

16        IT IS FURTHER ORDERED that, within ten days from the date of this Order,

17 Defendants Private Equity Management Group, Inc., Private Equity Management

18 Group, LLC and Danny Pang, and each of them, shall transfer to the registry of this

19 Court all assets, funds, and other property held in foreign locations in the name of

20 Private Equity Management Group, Inc., Private Equity Management Group, LLC

21 and Danny Pang, or for the benefit or under the direct or indirect control of any of

22 them, or over which any of them exercise control or signatory authority.

23                                              **XVII.**

24        IT IS FURTHER ORDERED that, immediately upon entry of this Order and

25 service therefore, defendant Danny Pang shall surrender to the Clerk of the Court all

26 passports that he holds.  The Clerk of the Court shall maintain custody of such

27 passports until otherwise ordered by this Court.

28 ///

                                              12

## XVIII.

IT IS FURTHER ORDERED that defendant Danny Pang is prohibited from travelling outside of the United States unless and until this Court finds that Pang has fully complied with the provisions of this Order that require him to provide an accounting and to repatriate any assets.

## IX.

IT IS FURTHER ORDERED that this Court shall retain jurisdiction over this action for the purpose of implementing and carrying out the terms of all orders and decrees which may be entered herein and to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

IT IS SO ORDERED.

DATED: 8/4/05

TIME: _____ o'clock ____.m.

HONORABLE PHILIP S. GUTIERREZ
UNITED STATES DISTRICT JUDGE

Presented by:

/s/ David J. Van Havermaat
David J. Van Havermaat
Lorraine B. Echavarria
Paris Wynn
Attorneys for Plaintiff
Securities and Exchange Commission

13

1  DAVID J. VAN HAVERMAAT, Cal. Bar No. 175761
   Email: vanhavermaatd@sec.gov
2  LORRAINE B. ECHAVARRIA, Cal. Bar No. 191860
   Email: echavarrial@sec.gov
3  PARIS WYNN, Cal. Bar No. 224418
   Email: wynnp@sec.gov
4
   Attorneys for Plaintiff
5  Securities and Exchange Commission
   Rosalind R. Tyson, Regional Director
6  Michele Wein Layne, Associate Regional Director
   John M. McCoy III, Regional Trial Counsel
7  5670 Wilshire Boulevard, 11th Floor
   Los Angeles, California 90036
8  Telephone:  (323) 965-3998
   Facsimile:  (323) 965-3908

9

10                  UNITED STATES DISTRICT COURT

11                  CENTRAL DISTRICT OF CALIFORNIA

12  SECURITIES AND EXCHANGE          Case No. CV 09-2901 PSG (Ex)
    COMMISSION,
13                                   **SECOND AMENDED
                                     COMPLAINT FOR
14              Plaintiff,           VIOLATIONS OF THE
                                     FEDERAL SECURITIES LAWS**
15          vs.

16  PRIVATE EQUITY MANAGEMENT
    GROUP, INC.; PRIVATE EQUITY
17  MANAGEMENT GROUP, LLC; and
    DANNY PANG,
18
                Defendants.
19

20          Plaintiff Securities and Exchange Commission ("Commission") alleges as

21  follows:

22                       **JURISDICTION AND VENUE**

23          1.     This Court has jurisdiction over this action pursuant to Sections 20(b),

24  20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.

25  §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of

26  the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78(u)(d)(1),

27  78u(d)(3)(A), 78u(e) & 78aa.  Defendants have, directly or indirectly, made use of

28  the means or instrumentalities of interstate commerce, of the mails, or of the

1    facilities of a national securities exchange in connection with the transactions, acts,

2    practices and courses of business alleged in this complaint.

3        2.    Venue is proper in this district pursuant to Section 22(a) of the

4    Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.

5    § 78aa, because certain of the transactions, acts, practices and courses of conduct

6    constituting violations of the federal securities laws occurred within this district,

7    and defendant Danny Pang resides in this district.

8                            **SUMMARY**

9        3.    This case involves the fraudulent offer and sale of securities by Danny

10   Pang ("Pang") and two entities he controlled:  Private Equity Management Group,

11   Inc. ("PEMG, Inc.") and Private Equity Management Group, LLC ("PEMG,

12   LLC") (together, the "Entity Defendants" or "PEMGroup" and, collectively with

13   Pang, "Defendants").

14       4.    From at least 2003, until the Court entered a temporary restraining

15   order in this action in April 2009, Pang and the Entity Defendants he controlled

16   engaged in a series of fraudulent offerings of securities.  Depending on the

17   particular security being offered, Defendants made oral and written representations

18   to investors that they would use investor funds for certain enumerated purposes,

19   which primarily were the acquisition of: (1) assets consisting of, and/or derived,

20   from life insurance policies issued to high net worth individuals; and (2) assets

21   and/or interests related to timeshares and the timeshare industry.

22       5.    In return for their investments, PEMGroup's investors were promised

23   semi-annual interest payments as well the return of their principal upon maturity of

24   the securities they purchased.  Additionally, Pang and PEMGroup assured investors

25   that both their principal and promised interest payments were fully insured and/or

26   "guaranteed" by a number of insurance policies that had been purchased from

27   reputable and highly rated insurance companies for the investor's benefit.

28       6.    To induce investors to purchase securities in PEMGroup's various

1  offerings, Pang and PEMGroup repeatedly made oral and written

2  misrepresentations concerning Pang's business acumen and credentials. In

3  speeches and promotional materials given to investors, as well as on PEMGroup's

4  webpage, Defendants stated that Pang was an accomplished financial professional

5  who had been a senior executive at Morgan Stanley and who had obtained several

6  advanced degrees from the University of California, Irvine.

7         7.     Through such representations, Defendants raised hundreds of millions

8  of dollars from several investors, which are predominantly large financial

9  institutions in Taiwan. In many instances, these institutions acquired the

10  PEMGroup-issued securities on behalf of, or later resold such securities to,

11  individual investors in Taiwan.

12         8.     Defendants' representations were false and misleading, and designed

13  and disseminated by Pang and PEMGroup in furtherance of their elaborate and

14  brazen scheme to defraud investors.

15         9.     Irrespective of, and in stark contrast to, Defendants' written and oral

16  representations concerning how investor funds would be utilized, at least as early

17  as June 2006, Pang and PEMGroup had decided to raise and utilize investor funds

18  for a variety of undisclosed and illicit and purposes, which include, but are not

19  limited to: (1) paying promised returns to earlier and existing PEMGroup investors

20  that had been placed in failing investment vehicles; (2) paying the premiums

21  associated with life insurance policies that had been purchased by earlier

22  PEMGroup investors; (3) making millions of dollars in undisclosed loans to

23  PEMGroup to fund the company's own lavish operating expenses, including the

24  company's acquisition of several luxurious aircraft; and (4) making millions of

25  dollars in undisclosed, unsecured and undocumented "loans" to Pang for his

26  personal use.

27        10.    Additionally, the assertions of Pang and PEMGroup regarding the

28  existence of supposed insurance guaranteeing investors' principal investments and

1  promised interest payments were equally misleading.  Indeed, several of the
2  policies shown and/or disseminated to investors were forgeries that had been
3  created by PEMGroup employees at the direction of Pang.

4       11.    Moreover, although entrusted with investor funds on the basis that
5  such funds would be profitably invested and competently managed, Pang and
6  PEMGroup engaged in the outright theft of at least $17 million dollars from
7  investors by, *inter alia*, paying themselves supposed "commissions" on non-
8  existent and/or fictitious deals.

9       12.    Finally, Contrary to Defendants' repeated assertions to investors, Pang
10  was not an accomplished professional and lacked the credentials that he and
11  PEMGroup routinely touted while soliciting investor participation in the various
12  offerings conducted by PEMGroup.  Contrary to the representations of Pang and
13  PEMGroup, Pang had not obtained any degrees from the University of California,
14  Irvine and never held any position at Morgan Stanley.

15                          **DEFENDANTS**

16       13.    Private Equity Management Group, Inc. is a Nevada corporation
17  located in Irvine, California.  Pang, as its president and a director, controlled and
18  directed the actions and operations of this entity.  PEMG, Inc. serves as the parent
19  company of PEMG, LLC, and through PEMG, LLC purports to invest in life
20  insurance policies and interests in timeshare-related assets.  PEMG, Inc. offered
21  and sold securities issued by various entities it controls.

22       14.    Private Equity Management Group, LLC is a Nevada limited liability
23  company located in Irvine, California.  Pang as a managing member controlled and
24  directed the actions and operations of this entity.  PEMG, LLC offered and sold
25  securities issued by various entities it controls.  PEMG, LLC purports to invest
26  primarily in life insurance policies and interests in timeshare-related assets.

27       15.    Danny Pang resides in Newport Beach, California.  Pang was the
28  president and a director of PEMG, Inc.  Pang was also a managing member of

1  PEMG, LLC.  Pang had sole control of and access to at least some of the bank

2  accounts into which investor funds were placed.

3  **THE FRAUDULENT SCHEME**

4  **The Investment As Represented To Investors**

5      16.    Since at least 2003, Defendants offered and sold securities and

6  purported to use the proceeds to purchase and/or finance the maintenance of, life

7  insurance policies issued to high net worth individuals, and/or to invest in

8  timeshare related assets.  Defendants offered and sold securities promising a 5.25%

9  to 7% annual rate of return, paid semi-annually.

10      17.    The securities were issued by various so-called "special purpose

11  vehicle" ("SPV") entities that Pang and the Entity Defendants established in the

12  British Virgin Islands.  Each SPV offering was referred to as a "fund" or a "tranche."

13  These funds or tranches were managed and controlled by Pang and PEMGroup.

14      18.    In connection with each of the offerings, PEMGroup and Pang

15  prepared and delivered to investors Confidential Private Offering Memoranda

16  ("CPOMs") and Confidential Preliminary Private Offering Memoranda

17  ("CPPOMs") that, among other things, represented to investors how their funds

18  would be used.  Pang was personally involved in the preparation of the CPPOMs

19  and CPOMs, which were drafted in PEMGroup's Irvine, California offices.

20      19.    Between 2004 and 2005, PEMGroup conducted several offerings to

21  raise money for an SPV called Genesis Voyager Equity Corporation ("GVEC"),

22  which is a business company incorporated in the British Virgin Islands.  The

23  GVEC offerings were conducted in six tranches.  The funds raised in the six

24  GVEC offerings were used to purchase life insurance policies.  In return for their

25  investments in the GVEC offerings, investors were promised annual interest

26  payments of between approximately 6% and 7.1%, which were payable

27  semiannually, as well as the return of their principal upon maturity.

28      20.    To maintain the viability of the life insurance policies until their

- 5 -

1  maturity date, the GVEC SPVs were required to make premium payments. To

2  make these premium payments, as well as the promised interest payments to

3  GVEC investors, each GVEC entity had a reserve fund that was established at its

4  inception. Additionally, Defendants anticipated that the death benefits the GVEC

5  SPVs received in connection with the underlying insurance policies would provide

6  an additional source of funding from which to make the requisite interest and

7  premium payments.

8  **Defendants' False And Misleading Representations To Investors**

9      21.    Between January 2006 and December 2006, PEMGroup conducted

10  several offerings to raise money for an SPV called GVEC Resource IV Inc.

11  ("GVECR IV"). The GVECR IV offerings were conducted in three tranches: (1)

12  GVECR IV Notes A; (2) GVECR IV Notes 2006 C; and (3) GVECR IV Notes

13  2006 D. The funds raised in the GVECR IV offerings were primarily intended for,

14  and were represented to investors as, investments in timeshare-related assets.

15      22.    In soliciting investors to purchase securities issued by GVECR IV

16  Notes A, GVECR IV Notes 2006 C and GVECR IV Notes 2006 D, Defendants

17  gave presentations consisting of oral and written assurances and representations

18  that the proceeds from the GVECR IV offerings would be used to purchase

19  timeshare-related assets.

20      23.    For instance, in or around July 2006, PEMGroup gave a power point

21  presentation (which was prepared by Pang and other PEMGroup personnel) to

22  Standard Chartered Bank Taiwan Ltd. ("Standard Chartered Bank") in connection

23  with its solicitation of the bank's July 2006 $75 million investment in GVECR IV

24  Notes A.[1] During this solicitation, PEMGroup provided representatives from

25  Standard Chartered Bank with oral and written descriptions of the investment

26

27  _____

[1]      At the time of its 2006 investments in PEMGroup's GVECR IV SPVs,
28  Standard Chartered Bank Taiwan Ltd was known as Hsinchu Commercial
   International Bank.

-6-

1 opportunities available in the timeshare industry and assurances that the bank's

2 funds were being raised for, and would be used for the purpose of, "Investment in

3 the real estate loans of the timeshare industry."

4      24.    Similarly, in or around November 2006, PEMGroup made a power

5 point presentation (which was prepared by Pang and other PEMGroup personnel)

6 to Standard Chartered Bank in connection with the solicitation of the bank's

7 November 2006 $100 million investment in GVECR IV Notes 2006 C. During

8 this solicitation, PEMGroup provided representatives from Standard Chartered

9 Bank with oral and written descriptions of the investment opportunities available in

10 the timeshare industry and assurances that the bank's funds were being raised for,

11 and would be used for the purpose of, "Investment in the real estate loans of the

12 timeshare industry."

13     25.    Finally, in or around December 2006, PEMGroup gave a power point

14 presentation (which was prepared by Pang and other PEMGroup personnel) to

15 Standard Chartered Bank in connection with the solicitation of the bank's December

16 2006 $79 million investment in GVECR IV Notes 2006 D. During this solicitation,

17 PEMGroup provided representatives from Standard Chartered Bank with oral and

18 written descriptions of the investment opportunities available in the timeshare

19 industry and assurances that its funds were being raised for, and would be used for

20 the purpose of, "Investment in the real estate loans of the timeshare industry."

21     26.    The CPPOMS and/or CPOMS associated with all of the GVECR IV

22 offerings represented that investor funds would be used to purchase timeshare-

23 related assets.

24     27.    Specifically, in the CPPOMS and/or CPOMs for the GVECR IV

25 Notes A, GVECR IV Notes 2006 C, and GVECR IV Notes 2006 D offerings, the

26 following language appears under the **"Description of the Underlying Assets"**

27 heading:

28 ///

The net proceeds received by the Issuer from the issuance and the sale of the Notes will be used to purchase the Underlying Assets, which include, without limitation: senior acquisition and development loans; subordinated acquisition and development loans; timeshare receivable loans; management fee receivable loans; and community fee receivable loans.

**The assets to which the Issuer will allocate include the following characteristics:**

A term no longer than the term of the Offering (48 months).

**\*\*\*\***

The asset types under consideration will include:

1. Secured loans for acquisition and development. A performance assurance rated not less than A by A.M. Best or another rating agency for senior loans may be required.

2. Tranches of timeshare-related securitizations, rated A or better.

3. Secured residential bridge mortgages. A performance assurance rated not less than A by A.M. Best of another rating agency for senior loans may be required.

4. Mortgage loans for acquisition and development. These assets require a performance assurance rated not less than A by A.M. Best or another rating agency.

5. Preferred return investments in timeshare-related limited partnerships, LLCs or other entities with performance assurances rated not less than A by A.M. Best or another rating agency.

6. Preferred return investments in timeshare receivables with performance assurances, rated not less than A by A.M. Best or another rating agency.

**Timeshare Industry Description**

Vacation ownership is a concept that originated in the French Alps in the 1960's. Now, 40 years later, it is firmly positioned as one of the most popular vacation options enjoyed by today's leisure travelers. Consumers are embracing timesharing, making it one of the fastest-growing sectors of the worldwide hospitality industry. In fact, vacation ownership has enjoyed a double-digit annual growth rate over the past two decades. With vacation ownership, consumers have the opportunity to purchase time at quality resorts offering an array of amenities in popular international destinations.

There are now more than a 5400 resorts in some 100 countries around the world and annual vacations ownership sales are estimated to be in excess of $9.4 billion. Today, 3 million U.S. households own 4.9 million weeks at nearly 1600 resorts. The average number of weeks owned per household has increased from 1.5 to 1.8 among those who first bought more than 12 years ago. Over 500,000 U.S. timeshare owners would like to buy more time

during the next three years in a resort area where they already own, and more than 650,000 want to buy in another resort area.

The traditional interval week program offers owners the use of their accommodations for one week – either for a specific week during the year or for a week during a time period or season. During the past several years, consumers have sought enhanced flexibility, which has fueled today's multiple use options. Vacation clubs give members access to resorts within a resort group, under a variety of different plans. In point-based programs, owners purchase points that can be redeemed for access to various types of accommodations, resort locations, amenities, number of days use, and other travel services. Point-based programs appeal to owners because they provide the flexibility to design their own vacations.

With vacation ownership, consumers make a one-time purchase of furnished resort accommodations, as a fraction of whole ownership costs, and pay an annual maintenance fee. Each condominium, or unit, of a vacation ownership resort is divided into intervals, either by the week or points equivalent, which are sold separately. The accommodations are priced according to a variety of factors, including size of the unit, resort amenities, location, and season. The purchaser owns the vacation accommodations, but only for the amount of time he or she plans to use it, typically one or two weeks each year. With timeshare, the owner has all the benefits or a vacation home without the year-round costs. From its origin, the idea behind timesharing was to give people the ability to purchase their future vacations - at current prices.

Timeshare programs and their related financing opportunities are becoming a strong asset class in investment portfolios. A subset of the hospitality and real estate, it has fewer operating risks than hotels, and its returns on equity are driven by sales of fractional or vacation ownership interests as opposed to returns on equity driven by refinancing or total sale of hotel properties on a stabilized basis.

28.     The CPPOMS and CPOMS associated with the GVECR IV Notes A, GVECR IV Notes 2006 C, and GVECR IV Notes 2006 D offerings were delivered to Standard Chartered Bank in or around July 2006, November 2006 and December 2006, respectively.

29.     However, as early August 2006, despite having raised over $75 million from Standard Chartered Bank based upon representations that such funds would be invested in timeshare assets, PEMGroup and Pang could not identify more than $30 million in suitable investments, due in part to the fact that PEMGroup was engaged in a dispute and/or litigation with Shell Vacations, which is the timeshare company in which Defendants had told Standard Chartered Bank that its funds would be invested.

-9-

1        30.    Because Pang and PEMGroup had largely failed to effectuate the

2   timeshare deals that were described to Standard Chartered Bank in connection with its

3   investments in the GVECR IV Notes A, Notes 2006 C and Notes 2006 D SPVs, the

4   bulk of Standard Chartered Bank's $220 million investment became a "slush fund"

5   from which Pang and PEMGroup misdirected and misappropriated millions of dollars.

6        31.    Contrary to Defendants' oral representations to investor Standard

7   Chartered Bank, as well as the explicit language in the CPPOMs and/or CPOMs

8   regarding use of investor funds, starting in September 2006, PEMGroup and Pang

9   actually used the investor funds raised in the GVECR IV offerings for a variety of

10  illicit and undisclosed purposes, which included but were not limited to: (1) the

11  purchase of impaired life insurance policies from earlier PEMGroup investors; (2)

12  millions of dollars in loans to PEMGroup to fund the company's exorbitant

13  operating expenses; and (3) millions of dollars in unsecured and undocumented

14  personal "loans" to Pang.  None of these uses and/or misappropriations of funds

15  were disclosed to Standard Chartered Bank, which invested over $200 million in

16  the GVECR IV SPVs.

17       32.    In August 2006, PEMGroup conducted an offering to raise money for

18  an SPV called GVEC II CDO Series 2006.  According to the applicable CPOM,

19  the funds raised in the GVEC II CDO Series 2006 were primarily intended for, and

20  were represented to investors as, investments in timeshare-related assets.  Bank

21  SinoPac was the only investor in this offering.

22       33.    In October 2006, PEMGroup conducted an offering to raise money for

23  an SPV called GVEC II Debentures Series 2006-A.  According to the applicable

24  CPOM, the funds raised in the GVEC II Debentures Series 2006-A were primarily

25  intended for, and were represented to investors as, investments in life insurance

26  related assets.  Bank SinoPac was the only investor in this offering.

27       34.    Between December 2006 and September 2008, PEMGroup conducted

28  several offerings to raise money for an SPV called GVEC Resource II Inc. ("GVECR

- 10 -

1  II"). The GVECR II offerings were conducted in approximately 23 tranches: (1)

2  Series 2006 A-1; (2) Series 2006 A-2; (3) Series 2006 A-3; (4) Series 2006 A-4; (5)

3  Series 2006 A-5; (6) Series 2007 A; (7) Series 2007 B; (8) Series 2007 C; (9) Series

4  2007 D; (10) Series 2007 E; (11) Series 2008 A1; (12) Series 2008 A2; (13) Series

5  2008 A3; (14) Series 2008 A4; (15) Series 2008 A5; (16) Series 2008 B; (17) Series

6  2008 C; (18) Series 2008 E; (19) Series 2008 G; (20) Series 2008 H-6; (21) Series

7  2008 H-7; (22) Series 2008 I; and (23) Series 2008 J. The funds raised in the

8  aforementioned GVECR II offerings were primarily intended for, and were

9  represented to investors as, investments in life settlement assets.

10      35.    The CPOMs and CPPOMs associated with all of the GVECR II

11  offerings represented that investor funds would be used to purchase life insurance

12  related assets, and were delivered to Hua Nan Bank and Cosmos Bank, who were

13  the two principal investors in the GVECR II SPVs.

14      36.    For instance, the following language appears in the CPPOMs and/or

15  CPOMs for the  GVECR II 2007 C, GVECR II 2008 A1 and GVECR II 2008 G

16  offerings (which were delivered to investors on or around September 3, 2007,

17  January 1, 2008 and May 1, 2008, respectively) under the **"USE OF**

18  **PROCEEDS"** heading:

19      The issuer intends to use the Offering proceeds to engage in premium
        finance transactions, with the balance of proceeds used to pay (a)
20      acquisition, servicing, trustee, custodian and origination fees, (b)
        management fees to the Manager, advisory fees to the Advisor, and (c)
21      administrative fees and expenses associated with this Offering.

22      The Issuer will use the proceeds from the Offering to acquire assets (the
        "Assets") consisting of:
23

24      • a portfolio of recourse and non-recourse premium finance loans (the
          "Loans") for the purchase of, and secured by a senior security interest
          in, newly-issued, non-variable life insurance policies (the "Policies")
25        insuring high-net-worth individuals over the age of 70 (the "Seniors");

26      • beneficial interest in a structured irrevocable life insurance trust (an
          "ILIT") that contains Policies;
27

28

- Policies acquired by the Issuer as a result of borrowers' Loan defaults, voluntary relinquishment of Policies by borrowers to the Issuer in satisfaction of the Loans or through the secondary market; and

- A twenty-four (24) month interest reserve.

The Issuer intends to acquire adequate Assets within three (3) months of the Issuance Date to secure periodic interest payments and repayment of principal to Debenture Holders at the Maturity Date. The Assets underlying the Debentures will be held by a trustee in one or more segregated custodial accounts with the Issuer as beneficiary. The Issuer intends to commence liquidation of adequate Assets not less than three (3) months prior to the Maturity Date to ensure payment of all principal and accrued but unpaid interest at the Maturity Date.

37.     Contrary to Defendants' oral representations to investors, as well as the explicit language in the CPPOMs and/or CPOMs regarding use of investor funds, PEMGroup and Pang actually used the funds raised in several of the GVECR II offerings for a variety of inappropriate and undisclosed purposes, which included, but were not limited to: (1) the purchase of impaired life insurance policies from earlier PEMGroup investors; (2) loans to fund PEMGroup's exorbitant operating expenses; and (3) millions of dollars in unsecured and undocumented personal "loans" to Pang.  None of these uses and/or misappropriations of funds were disclosed to investors in the GVECR II SPVs, even though such information was highly material.

38.     Additionally, Pang and PEMGroup engaged in the outright theft of additional millions of dollars in investor funds from the GVECR II SPVs, which was never disclosed to either Hua Nan Bank or Cosmos Bank, which are the two principal investors in the GVECR II SPVs.

39.     In April 2007, PEMGroup conduced an offering to raise money for an SPV called GVECR III Notes – Series 2007 A-4 ("GVECR III").  The funds raised in the GVECR III offerings were primarily intended for, and were represented to investors as, investments in life settlement assets.

///

///

///

*Defendants' Undisclosed Use of Investor Funds to Make Interest and Principal*
*Payments To, and Premium Payments on Behalf of, Earlier PEMGroup*
*Investors That Had Been Placed in Failing Investments*

40.     At least as early as June 2006, Pang and PEMGroup became aware that the life insurance policies purchased by the GVEC SPVs between 2004 and 2005 were not generating as much revenue as had been expected because the insureds under the applicable policies were living longer than PEMGroup had expected when the GVEC SPVs acquired the policies.  Because the insureds were living longer than anticipated, PEMGroup was not receiving death benefit payouts as quickly as it had expected.

41.     As a result of the poor performance of their life insurance policies, several of the GVEC SPVs lacked sufficient funds to make the (1) promised interest payments to GVEC investors, or the (2) premium payments associated with the life insurance policies GVEC had purchased.

42.     These twin shortfalls presented a critical problem for Pang, who viewed making timely interest payments as critical to PEMGroup's business, even telling some PEMGroup employees that, if PEMGroup missed an interest payment, "the business is done[,]" as investors would immediately lose all confidence in PEMGroup.  Additionally, if the premiums associated with the policies purchased by the GVEC SPVs were not paid, the policies would lapse and become worthless.

43.     Hence, at least as early as June 2006, Pang and PEMGroup were acutely aware that they needed to find funds sufficient to continue making interest payments to GVEC investors and premium payments to the insurance companies that issued the underlying life insurance policies.

44.     To address this dilemma, Pang and PEMGroup first attempted to sell some of GVEC's life insurance policies on the open market to generate funds sufficient to make the requisite interest and premium payments owed by the GVEC SPVs.  However, due to defects in the underlying life insurance policies (as well as

- 13 -

1    the manner in which they were packaged and sold), the policies were impaired.

2    Hence, Defendants' efforts to sell such policies in the open market were unsuccessful.

3        45.    Therefore, to obtain funds to make the interest and premium payments

4    associated with the GVEC tranches, at least as early as September 2006, Pang and

5    PEMGroup decided to utilize funds raised from subsequent investors in subsequent

6    offerings to purchase the impaired life insurance policies from several of the

7    GVEC tranches, irrespective of the fact that this course of action was plainly in

8    breach of the applicable CPPOMs and/or CPOMs and constituted egregious

9    breaches of the fiduciary duties owed to the affected investors.

10       46.    The proceeds from the illicit sales of life insurance policies from the

11   GVEC SPVs (whose securities had been purchased by earlier investors) to

12   subsequent investors in the GVECR IV and GVECR II SPVs  were then used to (1)

13   pay interest and repay principal to the earlier investors who had invested in the

14   under-performing GVEC SPVs, and to (2) make the premium payments on the life

15   insurance policies purchased by the GVEC entities.

16       47.    The sales of GVEC's impaired and underperforming life insurance

17   policies to the GVECR IV and GVECR II SPVs were made at a premium to cost,

18   even though PEMGroup and Pang knew these assets were impaired and could not

19   be sold in the open market.

20       48.    On numerous occasions from 2006 through 2008, Pang and

21   PEMGroup, who were aware that the life insurance assets held by the GVEC

22   tranches were not generating sufficient revenues to pay the requisite interest,

23   principal and/or premium payments, addressed these deficits by selling impaired

24   life insurance policies from the under-performing GVEC SPVs to subsequent

25   investors in the newer GVECR IV and GVECR II SPVs.  The proceeds from these

26   illicit sales were then used to make the requisite interest, principal and/or premium

27   payments to, or on behalf of, GVEC and/or its investors.

28       49.    For instance, in September 2006, Pang and PEMGroup were aware

- 14 -

1   that the life insurance policies held by the GVEC Preferred Shares C1 ("GVEC PS-

2   C1") SPV were underperforming and could not generate sufficient revenue to pay

3   returns to investors that had purchased securities issued by GVEC PS-C1.

4   Therefore, in order to generate sufficient revenues to cover the promised interest

5   payments to GVEC PS-C1's investors, on or around September 29, 2006,

6   PEMGroup and Pang ordered the sale of life insurance assets from GVEC PS-C1

7   to GVECR IV Notes A, even though the funds contained in the GVEC Notes A

8   tranche had been raised based upon written and oral representations to Standard

9   Chartered Bank, GVECR IV Notes A's sole investor, that such funds would be

10   invested in timeshare-related assets.

11       50.   Additionally, Pang caused GVECR IV Notes A to purchase GVEC

12   PS-C1's life settlement assets at a premium to cost, even though Pang knew that

13   such assets were seriously impaired and could not be sold in the open market.

14       51.   Standard Chartered Bank was never told that its funds could be used

15   (and were being used) to purchase – at a premium to cost – underperforming and

16   impaired life insurance policies from SPVs associated with earlier PEMGroup

17   offerings, so that investors in such earlier offerings could be paid their interest and

18   repaid their principal.

19       52.   In January 2008, Pang and PEMGroup were aware that the life

20   insurance assets held by the GVEC Preferred Shares A ("GVEC PS-A") SPV were

21   underperforming and could not generate sufficient returns to make interests

22   payments to GVEC PS-A's investors.  Therefore, to generate sufficient revenues to

23   cover the promised interest payments, in February 2008, PEMGroup and Pang

24   ordered the sale of life insurance assets from GVEC PS-A to a GVECR II SPV,

25   even though the funds contained therein had been raised based upon

26   representations to GVECR II investors that such funds would be invested in newly

27   issued life insurance policies.

28       53.   Pang caused the GVECR II SPV to purchase GVEC PS-A's life

- 15 -

1  settlement assets at a premium to cost, even though Pang knew that such assets
2  were seriously impaired and could not be sold in the open market.

3      54.    The investors in GVECR II were never told that their funds could be
4  used (and were being used) to purchase – at a premium to cost – underperforming
5  and impaired life insurance policies from SPVs associated with earlier PEMGroup
6  offerings, so that investors in such earlier offerings could be paid their interest and
7  repaid their principal.

8      55.    In April 2008, Pang and PEMGroup were aware that the life
9  settlement assets held by the GVEC Preferred Shares B1 ("GVEC PS-B1") SPV
10  were underperforming and could not generate sufficient returns to make interest
11  payments to GVEC PS-B1's investors.  Therefore, in order to generate sufficient
12  revenues to cover the interest payments to the GVEC PS-B1 investors, in April
13  2008, PEMGroup and Pang ordered the sale of life settlement assets from the
14  GVEC PS-B1 SPV to a GVECR II SPV, even though the funds contained therein
15  had been raised based upon representations to GVECR II investors that such funds
16  would be invested in newly issued life insurance policies.

17      56.    Pang caused the GVECR II SPV to purchase GVEC PS-B1's life
18  settlement assets at a premium to cost, even though he knew the assets were
19  impaired and could not be sold in the open market.

20      57.    The investors in the GVECR II SPV were never told that their funds
21  could be used (and were being used) to purchase – at a premium to cost –
22  underperforming and impaired life insurance policies from SPVs associated with
23  earlier PEMGroup offerings, so that investors in such earlier offerings could be
24  paid their interest and repaid their principal.

25      58.    In the Summer of 2008, PEMGroup's CFO warned Pang about
26  PEMGroup's practice of selling impaired life insurance assets from earlier
27  investors to later investors, explaining that PEMGroup owed fiduciary duties to its
28  investors on both sides of such transactions, and that one group of investors would

- 16 -

1   invariably end up with the "short end of stick." PEMGroup's CFO additionally

2   warned Pang that PEMGroup's practice of selling impaired assets from earlier

3   investors to later investors resembled a Ponzi scheme.

4        59.   In response to the CFO's 2008 warning regarding the sale of impaired

5   life settlement assets from earlier PEMGroup investors to later investors, Pang stated

6   that the market for such assets was currently depressed, and that PEMGroup needed

7   to preserve such assets by continuing to sell them to later PEMGroup investors.

8        60.   At the time of his initial decision (which occurred at least as early as

9   June 2006) to pay returns to one group of investors by misappropriating funds from

10  a later group of investors, Pang was fully aware that he would have to raise and

11  misappropriate additional funds from even later groups of investors to repay the

12  first victims of his misappropriations.

13       61.   On many occasions, Pang told other PEMGroup partners that the

14  company's investment in a coal mine in China (which was made in 2006 from

15  funds misappropriated from Standard Chartered Bank's investments in the GVECR

16  IV SPVs) would generate sufficient returns to repay all investors and provide

17  PEMGroup with an exit from its Ponzi-like scheme.

18       62.   In November 2008, PEMGroup and Pang were aware that PEMGroup

19  and/or GVEC Preferred Shares D1 ("GVEC PS-D1") SPV lacked the resources to

20  make premium payments on the life insurance policies held by the GVEC PS-D1

21  SPV. To generate cash to pay the premiums for this SPV, on November 5, 2008

22  PEMGroup and Pang approved the sale of two life insurance policies from GVEC

23  PS-D1 to GVECR II 2007 C.

24       63.   Pang caused GVECR II 2007 C to purchase GVEC PS-D1's life

25  settlement assets at a premium to cost, even though he knew the assets were

26  impaired and could only be sold at a substantial loss in the open market.

27       64.   The investor in GVECR II 2007 C was never told that its funds could

28  be used (and were being used) to purchase – at a premium to cost –

- 17 -

1   underperforming and impaired life insurance policies from SPVs associated with
2   earlier PEMGroup offerings, in order to generate cash to pay premiums on life
3   insurance policies purchased by earlier PEMGroup investors.

4       65.   In December 2008, PEMGroup and Pang were aware that PEMGroup
5   and/or GVECR II 2006 A and GVECR II 2007 B lacked the resources to make
6   premium payments on the life insurance assets held by GVECR II 2006 A and
7   GVECR II 2007 B.  On December 8, 2008, PEMGroup's Controller sent an email
8   to Pang and PEMGroup's CFO that included the following request, which was
9   immediately approved by Pang: "To generate enough cash to facilitate these
10  premium payments, please advise approval on the sale of the following policies
11  from GVECR II 2006 A and GVECR II 2007 B to GVECR II 2008 G[.]"

12      66.   Pang caused GVECR II 2008 G to purchase policies from GVECR II
13  2006 A and GVECR II 2007 B at a premium to cost, even though he knew the
14  assets were impaired and could only be sold in the market at a substantial loss.

15      67.   The investor in GVECR II 2008 G was never told that its funds could
16  be used (and were being used) to purchase – at a premium to cost –
17  underperforming and impaired life insurance policies from SPVs associated with
18  earlier PEMGroup offerings, in order to generate cash to pay premiums on life
19  insurance policies purchased by earlier PEMGroup investors.

20      68.   In December 2008, Pang ordered the sale of underperforming GVEC
21  PS-B1 life insurance policies to Fides, which was supposed to be PEMGroup's
22  "captive insurance company" that existed for the sole purpose of insuring
23  investors' investments in the various PEMGroup offerings.

24      69.   But while the PEMGroup executive that operated Fides was willing to
25  use assets deposited in Fides accounts to purchase the impaired policies, he resisted
26  purchasing them at the 10% internal rate of return that GVEC's co-manager in
27  Taiwan (James Yen) had been accustomed to receiving.  When Mr. Yen
28  complained, in a December 8, 2008 email Pang asked PEMGroup's CFO to

1  contact Mr. Yen and deal with his complaint.

2      70.    On December 8, 2008, PEMGroup's CFO sent Pang a reply email, in

3  which he stated that: "I can't make the call to legitimately sell these files with a

4  10% IRR to Fides (or Irvine Insurance).  I can't continue to lie to James that we're

5  selling these 2 files to a third party when in fact the third party is Fides (Irvine

6  Insurance.)  We have set a standard so high to James that the FMV is  paying 10+

7  when the files are being bidded at much less."

8      ***Forgeries and False and Misleading Statements Regarding The Existence of***

9      ***Insurance That Supposedly "Guaranteed" Investments In PEMGroup***

10     71.    Pang and PEMGroup also made false and misleading statements to

11 investors regarding the existence of insurance, which supposedly "guaranteed"

12 their investments (*i.e.*, all of the promised interest payments as well as their

13 principal investments.)

14     72.    In 2006 Pang and PEMGroup told investors Bank SinoPac and

15 Standard Chartered Bank that PEMGroup had secured a $108 million insurance

16 policy from a company called HCC that guaranteed their investments with

17 PEMGroup.  In truth, the policy that PEMGroup had obtained from HCC only

18 afforded $31 million in coverage.

19     73.    Several potential investors demanded to see the actual $108 million

20 policy.  This demand constituted a problem for Pang and PEMGroup, who knew

21 that no such policy existed.

22     74.    For instance, on or around July 30, 2006, an employee in

23 PEMGroup's Taiwan office informed Pang and PEMGroup's COO that, in

24 addition to the applicable CPOM, investor Standard Chartered Bank wanted proof

25 of the existence of the insurance coverage that Pang and PEMGroup had stated

26 guaranteed the bank's investment in GVECR IV Notes A.  Specifically, Pang was

27 told that Standard Chartered Bank demanded a:

28         Letter by assurance broker stating the purchase of assurance, name of

1    assuror and underlying assets mentioned on the CPOM covered by the
     assurance. (Hsinchu Bank wants to make sure the underlying assets
2    are 100% assured, therefore, its investment in Notes A will be 100%
     assured.)

3        75.    In response to such requests to see proof of the policy, Pang, *inter*
4    *alia*, directed the forgery of a $108 million insurance policy and the circulation of
5    that forged policy to investors. From within the company's Irvine, California
6    offices, PEMGroup employees forged the $108 million HCC policy at Pang's
7    direction, and it was shown and/or provided to investors in order to induce their
8    investments.

9        76.    For instance, Defendants showed and subsequently provided the
10   forged HCC policy to Standard Chartered Bank in connection with their efforts to
11   induce the Bank to invest in the GVECR IV Notes A, 2006 C and/or 2006 D SPVs.
12   Indeed, Standard Chartered Bank has confirmed that it received a copy of the
13   forged $108 million policy in 2006.

14       77.    The forged policy was also shown to investor Bank SinoPac. In or
15   around October 2006, representatives of Bank SinoPac attended meetings with
16   Pang and other PEMGroup employees at PEMGroup's Irvine, California offices,
17   as well as in Napa Valley, California. During a presentation aimed at convincing
18   Bank SinoPac to invest in the GVEC II Series 2006-A offering, PEMGroup
19   employees showed the forged HCC policy to Bank SinoPac representatives.

20       78.    In November 2006, PEMGroup and Bank SinoPac were engaged in
21   negotiations concerning Bank SinoPac's investment in GVEC II Series 2006-A. On
22   November 16, 2006, an attorney representing Bank SinoPac sent PEMGroup a draft
23   agreement that explicitly referenced the forged $108 million HCC insurance policy:

24           Participant was furnished a copy of Policy with policy number 06L-
             US-R-1015-PEMRV issued by HCC to the insured, Lead Lender has
25           agreed to participate in and assume a portion of the rights and
             obligations with respect to the Policy in the ratio of forty two percent
26           (42.5%) of the Insured Value in the amount of US $108,000,000.

27       79.    Upon receipt of the draft agreement from Bank SinoPac, which
28   referenced the forged $108 million policy, an attorney at PEMGroup (who was

                                     - 20 -

1   presumably unaware of the forgery ordered by Pang) sent Pang and two additional

2   PEMGroup executives a November 16, 2006 email stating the language in the draft

3   referencing the HCC Policy was unacceptable as: "It sets the HCC RVI Policy

4   Limit at $108,000,000 instead of the $31,900,000." (emphasis added.)

5      80.    In order to prevent this attorney from alerting Bank SinoPac's

6   attorney that the HCC policy limit was only $31, rather than $108 million, Pang

7   sent a November 16, 2006 reply email to the PEMGroup attorney, in which he

8   stated: "Please meet up and talk about this. DO NOT send out the response to

9   [Bank SinoPac] yet."

10     81.    Pang and PEMGroup then convinced Bank SinoPac to remove the

11  language referencing the $108 million HCC policy from the agreement by

12  asserting that the policy's provisions were confidential and had to be protected

13  from disclosure.

14  ***Undisclosed Loans of Investor Funds to PEMGroup to Fund The Company's***

15  ***Exorbitant Operating Expenses***

16     82.    At least as early as October 2006, Pang and PEMGroup began using

17  investor funds to make undisclosed loans to PEMGroup to fund its lavish operating

18  expenses. By October 2006, PEMGroup's burn rate had become unsustainable as

19  result of the profligate spending that the company undertook at Pang's direction.

20  Because PEMGroup's expenses were in excess of even the exorbitant amounts that

21  Pang and PEMGroup took in fees and commissions, Pang was forced to identify

22  alternate sources of funding to keep pace with PEMGroup's expenses.

23     83.    At least as early as October 2006, Pang decided to use the investor

24  funds that had already been raised, as well as investor funds that would be raised

25  by PEMGroup in the future, in order to pay PEMGroup's operating expenses.

26  Specifically, Pang caused the SPVs, which contained investor assets and/or funds,

27  to make loans to PEMGroup, which, in turn, used the funds for various operating

28  expenses of the company, which include but are not limited to: payroll costs, the

1   opening of a new PEMGroup office in Shanghai, a 2007 Christmas party in China

2   (which was attended by employees from all PEMGroup offices) and a three-day

3   2008 Christmas party aboard a Disney cruise ship (which was attended by

4   employees from all PEMGroup offices).

5        84.    For instance, on or around October 10, 2006, Pang and PEMGroup

6   caused GVECR IV 2006 A to lend PEMGroup $2 million.  Defendants then used

7   this $2 million, which had been invested by Standard Chartered Bank based upon

8   Defendants' representations that its funds would be invested in timeshare-related

9   assets, to pay the operating expenses (*e.g.*, rents and salaries) associated with

10  PEMGroup's sales office in Taipei.

11       85.    On or around January 23, 2007, Pang and PEMGroup caused GVECR

12  IV 2006 C to lend PEMGroup $1 million.   Defendants then used this $1 million,

13  which had been invested by Standard Chartered Bank based upon Defendants'

14  representations that its funds would be invested in timeshare-related assets, to pay

15  the operating expenses (*e.g.*, rents and salaries) associated with PEMGroup's office

16  in Shanghai.

17       86.    On or around June 5, 2007, Pang and PEMGroup caused GVECR IV

18  2006 D to lend PEMGroup $4 million.  Defendants then used this $4 million,

19  which had been invested by Standard Chartered Bank based upon Defendants'

20  representations that its funds would be invested in timeshare-related assets, to pay

21  the operating expenses (*e.g.*, registered capital, rents and salaries) associated with

22  PEMGroup's office in Shanghai.

23       87.    Additionally, on or around November 26, 2007, Pang caused GVECR

24  IV 2006 C to lend $1.5 million to PEMGroup.  On November 21, 2007,

25  PEMGroup's CFO wrote an email to Pang, which informed him that, "We have

26  only $18k in available limit on our AMEX and I project a cash need of $1.3M by

27  the end of next week and I haven't received the Global Exec invoice for the Dubai

28  trip yet."  In the email, the CFO asked Pang whether he had, "Any thoughts on

- 22 -

1    how we are going to service our cash crunch[,]" and whether Pang could "borrow

2    funds from GVECR IV." On November 21, 2007, Pang responded to the CFO's

3    email and wrote "[g]o ahead to borrow 5 mil."

4            88.    On or around December 14, 2007, Pang caused GVECR IV 2006 C to

5    lend an additional $1.5 million to PEMGroup in order to fund the company's

6    operating expenses, which included, but were not limited to, credit card bills,

7    salaries and a company trip to China. On December 14, 2007, the Controller for

8    PEMGroup asked in an e-mail that Pang and PEMGroup's CFO approve an "inter-

9    account transfer of $1,500,000 from GVECR IV . . . to PEMG." Approximately

10   thirty minutes after the Controller's request, Pang responded, "That's fine.

11   Thanks." The Controller then asked the CFO to approve the transaction as well,

12   which he did.

13           89.    On or around January 1, 2008, Pang caused GVECR IV Notes A to

14   lend PEMGroup $1 million, in order to provide a $1 million dollar retainer to the

15   law firm Fulbright and Jaworski LLP, which had been hired to perform services

16   wholly unrelated to the GVECR IV Notes A SPV.

17           90.    On or around January 11, 2008, Pang caused GVECR IV Notes A to

18   lend PEMGroup $200,000 to enable the company to meet its operating expenses,

19   which included, but were not limited to, company credit card bills and payroll costs.

20           91.    On or around January 22, 2008, Pang caused GVECR IV 2006 C to

21   lend PEMGroup $500,000, which the company then used to pay its operating

22   expenses, which included, but were not limited to, credit card bills and payroll

23   costs. On January 22, 2008, PEMGroup's Controller asked that Pang and

24   PEMGroup's CFO approve a transfer of $500,000 from GVECR IV 2006 C to

25   PEMGroup. Less than an hour later, Pang responded and said, "Please accept this

26   email as my approval."

27           92.    On or around January 29, 2008, Pang caused GVECR IV 2006 C to lend

28   PEMGroup $300,000, which the company then used to pay its operating expenses,

1  which included, but were not limited to, credit card bills and payroll costs.  On

2  January 29, 2008, PEMGroup's Controller requested that Pang approve a $300,000

3  wire transfer from GVECR IV 2006 C to PEMGroup.  One minute later on January

4  29, 2008, Pang sent the Controller the following email response: "approved."

5      93.    On or about July 28, 2008, Pang caused GVECR II 2007 C to loan

6  PEMGroup $3 million.  On July 28, 2008, PEMGroup's Controller asked in an e-

7  mail that Pang and PEMGroup's CFO approve a transfer of $3 million from

8  GVECR II 2007 C to PEMGroup.  Within a few minutes, Pang responded via e-

9  mail that the transfer was "approved."

10     94.    On November 19, 2008, Pang caused GVECR IV 2006 C to loan

11 PEMGroup $500,000.  On November 19, 2008, PEMGroup's Controller informed

12 Pang, as well as the COO and CFO of PEMGroup, that "[p]ayment of the AMEX

13 is due in full today and we need to remit at least $100K to Taipei for their

14 November expenses.  Kindly approve PEMG to borrow $500K from GVECR IV

15 2006 C."  Approximately 6 hours later on November 19, 2008, Pang sent the

16 following email response: "Approve."

17     95.    On or about November 25, 2008, Pang caused GVECR II 2007 C to

18 lend $1.5 million to PEMGroup.  On November 25, 2008, PEMGroup's Controller

19 informed Pang and PEMGroup's COO that, "We have some payables due to be

20 paid today including payroll, payment for Disney Cruise, remittance to Taipei and

21 monthly expenses."  The Controller asked that Pang approve a $1.5 million loan

22 from GVECR II 2007 C to PEMGroup, and also informed Pang that "...we will

23 need additional $500K by the week of December 8th."  A few minutes after receipt

24 of the Controller's November 25, 2008, Pang responded and wrote, "Please accept

25 this email as my approval for both $1.5 mil and $500,000 transaction."

26     96.    The CPPOMs and CPOMs associated with the affected SPVs never

27 disclosed to investors the plainly material information that their invested funds

28 could be used to make "loans" to PEMGroup to enable the company to fund its

- 24 -

1   exorbitant operating expenses.

2       97.    Similarly, investors in the pertinent SPVs were never otherwise

3   informed of the highly material information that their invested funds could be used

4   (and had been used) to make loans to PEMGroup to fund its exorbitant operating

5   expenses.  As of May 1, 2009, PEMGroup owes investors approximately $17

6   million in outstanding loans.

7       *Undisclosed Loans of Investor Funds to PEMGroup to Fund The Company's*

8                              *Acquisition of Aircraft*

9       98.    In addition to the undisclosed loans to PEMGroup for its operating

10  expenses, in 2007, Pang and PEMGroup caused investor funds to be utilized to

11  make loans to PEMGroup for the purpose of aircraft acquisitions.

12      99.    In June 2007, Pang caused an $18 million loan to be made from

13  GVECR IV 2006 D to InterTravel and Services, Inc., which is an entity controlled

14  by Pang and PEMGroup.  This $18 million dollar loan was used to fund the

15  purchase of a Gulfstream G4 aircraft for PEMGroup.  The investor in GVECR IV

16  2006 D, which had received oral and written representations from Pang and

17  PEMGroup that their invested funds would be used to acquire timeshare properties,

18  was never told that its funds could be used (and had been used) to make loans to

19  PEMGroup for the purpose of purchasing aircraft for the company.

20      100.   On October 16, 2007, Pang caused an $11 million loan to be made

21  from GVECR II 2007 C to Inter Travel and Services, Inc.  This $11 million dollar

22  loan was used to fund the purchase of Lear Jet aircraft for PEMGroup.  The investor

23  in GVEC II 2007 C, which had received oral and written representations from Pang

24  and PEMGroup that its invested funds would be used to acquire life insurance

25  related assets, were never told that their funds could be used (and had been used) to

26  make loans to PEMGroup for the purchase of aircraft for the company.

27      101.   In a February 9, 2009 memorandum to Pang and the other PEMGroup

28  partners, PEMGroup's General Counsel acknowledged that the loans made to

1  PEMGroup were improper:

2  　　　　I am of the opinion that many of the loans to the PEMGROUP
3  　　　　companies do not fall with the provisions of the CPOMS, the basis
　　　　　upon which the funds were provided by the investors and set out the
　　　　　contractual obligations that the issuers and their agents and
4  　　　　subcontractors, namely our good selves, are subject. As a result, if
　　　　　there is a shortfall with respect to repayment of the tranches to the
5  　　　　investors and this shortfall is in any way impacted as a result of such
　　　　　loans the liability for that shortfall will, I consider, fall upon you as the
6  　　　　proprietors. The rationale being not only is there a clear breach of
　　　　　contractual obligations, but also a breach of the fiduciary duty owed to
7  　　　　investors with regard to the management and investment of their funds.

8  ***Undisclosed, Unsecured and Undocumented "Loans" of Investor Funds to Pang***

9  　　　　102.   In 2008 alone, Pang received total compensation from PEMGroup in

10  the amount of $32.9 million. Irrespective of the fact that he caused PEMGroup to

11  pay him huge amounts of money in salary, as well as in questionable bonuses and

12  commissions, Pang began to supplement his income by blatantly misappropriating

13  investor funds.

14  　　　　103.   At least as early as July 2007, Pang began to take unsecured and

15  interest-free personal "loans" from several of the SPVs and other PEMGroup

16  related entities, which contained investor funds. The overwhelming majority of

17  these supposed loans were never repaid to investors.

18  　　　　104.   For instance, on or around July 26, 2007, Pang caused ERML (a

19  PEMGroup entity) to loan $1 million to Nevada Capital Partners ("NCP"), which

20  is an entity controlled by Pang.

21  　　　　105.   Subsequently, on or around August 23, 2007, Pang caused ERML to

22  lend him $650,000.

23  　　　　106.   On or around January 31, 2008, Pang caused GVECR IV Notes 2006

24  D to lend $2 million to LSPC, Inc. ("LSPC"), which is an entity controlled by

25  Pang. On January 31, 2008, PEMGroup's Controller sent an email to Pang,

26  PEMGroup's CFO and a representative at East West Bank (which maintained

27  account for GVERC IV Notes 2006 D that contained investor funds), in which she

28  requested that East West Bank, upon approval from Pang, transfer $2 million from

-26-

1 | a GVECR IV account to LSPC's account.

2 |  107.  In response to the Controller's email, Pang sent the following reply

3 | email to the Controller and the East West Bank representative: "Please accept this

4 | email as my approval.  Thanks."

5 |  108.  Similarly, on or around April 22, 2008, Pang caused GVECR IV

6 | Notes A to loan him $1 million.

7 |  109.  On or around April 23, 2008, Pang caused GVECR IV Notes A to

8 | lend $1.5 million to Nevada Capital Development Partners ("NCDP"), which is an

9 | entity controlled by Pang.

10 |  110.  Also, on or around September 26, 2008, Pang caused GVECR II 2007

11 | C to loan LSPC $2.5 million.

12 |  111.  On or about November 5, 2008, Pang caused GVECR II 2008 A and

13 | GVECR II 2008 G to lend LSPC a total of $2.5 million.

14 |  112.  In total, Pang caused the SPVs and other PEMGroup entities to "lend"

15 | him approximately $11.5 million.  As of May 1, 2009, Pang owes the SPVs and

16 | PEMGroup $8.3 million.

17 |  113.  No contemporaneous formal documentation was created in connection

18 | with the purported loans from the various SPVs to Pang and/or the various entities

19 | he controls.

20 |  114.  The CPPOMs and CPOMs associated with the affected SPVs (*e.g.*,

21 | GVECR IV Notes A, GVECR IV Notes 2006 C, GVECR IV Notes 2006 D,

22 | GVECR II 2007 C, GVECR II 2008 A and GVECR II 2008 G) never disclosed to

23 | investors the highly material fact that their invested funds could be used to make

24 | personal and unsecured loans to Pang and/or entities controlled by Pang, such as

25 | LSPC, NCP and NDCP.

26 |  115.  Similarly, investors in the pertinent SPVs were never otherwise

27 | informed that their invested funds could be used (and had been used) to make

28 | personal and unsecured loans to Pang and/or entities controlled by Pang, such as

1  LSPC, NCP and NDCP.

2      116.   In a February 9, 2009 memorandum to Pang and the other PEMGroup

3  partners, PEMGroup's General Counsel acknowledged that the loans made to Pang and

4  the entities controlled by Pang were "clearly outside the CPOMs and a clear breach of

5  our contractual and fiduciary obligations owned to investors." (emphasis added.)

6              *Pang's Theft of Investor Funds for Personal Use*

7      117.   In addition to the undisclosed "loans" that Pang caused the SPVs to

8  make to him, between 2007 and 2008 Pang misappropriated $13 million from the

9  SPVs and used it to pay unearned "commissions" to himself and to his associates.

10     118.   Typically, PEMGroup paid itself commissions in connection with its

11  acquisition of life insurance policies on behalf of investors.  These "commissions,"

12  which were 4% of the face value of the underlying policy, were supposed to be

13  paid to PEMGroup *after* it had acquired the pertinent life insurance contracts.

14     119.   Starting in late 2007, however, Pang directed the payment of

15  "commissions" on life insurance policies that PEMGroup *had not acquired or*

16  *purchased*.  The money to pay these so-called commissions was "borrowed" from

17  several of the GVECR II SPVs that contained investor funds, including GVECR II

18  2007 D, GVECR II 2007 E, GVECR II 2008 A, GVECR II 2008 B, GVECR II

19  2008 C, GVECR II 2008 G, GVECR II 2008 H and GVECR II 2008 I.

20     120.   The deals upon which the improper commissions were based were

21  *never consummated*.  Nevertheless, as of May 1, 2009, the PEMGroup executives

22  that received the unearned $13 million in commissions associated with the failed

23  deals have not repaid them.

24     121.   Investors in the pertinent GVECR II SPVs were never given the

25  highly material information that their funds would be used to pay commissions to

26  PEMGroup executives for deals that never happened.

27     122.   Moreover, in March 2007, Pang misappropriated an additional $4

28  million from PEMGroup's investors.  PEMGroup had accused its former president

                                    - 28 -

1  of embezzling approximately $4 million from PEMGroup's investors by causing

2  several of the PEMGroup affiliated SPVs (which contained investor funds) to pay

3  inflated amounts for life insurance policies, and then keeping a percentage of the

4  inflation for himself.

5       123.   In March 2007, the former president paid $4 million back to

6  PEMGroup's investors in settlement of those accusations. However, rather than

7  return the money to investors by depositing it into the accounts of the appropriate

8  SPVs, on March 13, 2007 Pang immediately misappropriated the $4 million by

9  depositing the money into an account that he controlled at East West Bank.

10       124.   The account at East West Bank was in the name of GVEC Resource

11  IV, Inc. The mailing address for the account was the same address as PEMGroup's

12  Irvine, California offices: GVEC Resource IV, Inc., c/o Equity Resource

13  Management, Ltd., One Park Place Plaza, Suite 550, Irvine California 92614.

14       125.   This account was created in connection with the formation of the

15  GVECR IV SPVs. But rather than close the account after the GVECR IV SPVs

16  had been created and funded, Pang instructed that it be kept open for his personal

17  and exclusive use. Indeed, Pang kept a check book for this account in his desk

18  drawer and repeatedly wrote checks on this account for personal matters.

19       126.   Once the $4 million was deposited into the GVEC Resource IV

20  account at East West Bank, which Pang exclusively controlled, Pang proceeded to

21  divide and distribute these funds amongst PEMGroup's senior management and

22  kept more than $2 million for himself.

23       127.   For instance, on or around March 13, 2007, Pang wrote himself a

24  check in the amount of $500,000, which was drawn from the GVEC Resource IV

25  account at East West Bank where the $4 million in investor funds that had been

26  returned by the former PEMGroup president had been deposited.

27       128.   Similarly, on or around March 13, 2007, Pang wrote a check for $1

28  million to Nevada Capital Holdings, an entity controlled by Pang, which was

1   drawn from the GVEC Resource IV account at East West Bank where the $4

2   million in investor funds that had been returned by the former PEMGroup

3   president had been deposited.

4          129.    On or around March 13, 2007, Pang wrote a check for $250,000 to

5   Sundulas, an entity controlled by a senior PEMGroup employee, which was drawn from

6   the GVEC Resource IV account at East West Bank where the $4 million in investor

7   funds that had been returned by the former PEMGroup president had been deposited.

8          130.    Again, on or around March 13, 2007, Pang wrote a check for

9   $250,000 to Q2 Resources, an entity controlled by PEMGroup's CFO, which was

10  drawn from the GVEC Resource IV account at East West Bank where the $4

11  million in investor funds that had been returned by the former PEMGroup

12  president had been deposited.

13         131.    On or around March 17, 2007, Pang wrote himself a check for

14  $600,000, which was drawn from the GVEC Resource IV account at East West

15  Bank where the $4 million in investor funds that had been returned by the former

16  PEMGroup president had been deposited.

17         132.    On or around April 12, 2007, Pang wrote himself a check for

18  $550,000, which was drawn from the GVEC Resource IV account at East West

19  Bank where the $4 million in investor funds that had been returned by the former

20  PEMGroup president had been deposited.

21         133.    On or around May 11, 2007, Pang wrote a $200,000 check for

22  "CASH", which was drawn from the GVEC Resource IV account at East West

23  Bank where the $4 million in investor funds that had been returned by the former

24  PEMGroup president had been deposited.

25         134.    On or around July 7, 2007, Pang wrote himself a check for $600,000,

26  which was drawn from the GVEC Resource IV account at East West Bank where

27  the $4 million in investor funds that had been returned by the former PEMGroup

28  president had been deposited.

- 30 -

1

*Misleading Net Asset Value Reports*

2    135.   In connection with their fraudulent scheme, Defendants caused false
3    and misleading Net Asset Value ("NAV") Reports to be distributed to investors.
4    These reports, which were ostensibly prepared by HSBC Bank and had the HSBC
5    logo affixed upon them, purported to represent the net asset value of an investor's
6    investment in the applicable PEMGroup SPV, and were routinely distributed to
7    investors by Pang and PEMGroup from PEMGroup's Irvine, California offices.

8    136.   In several respects, these NAV Reports were materially false and
9    misleading.  First of all, many of the reports were prepared and distributed by
10   PEMGroup, as opposed to HSBC.  Indeed, on December 19, 2006, a PEMGroup
11   employee sent Pang and PEMGroup's CFO an email, in which she stated that:  "I
12   am aware that recent NAVs are issued by you NOT HSBC, why?"

13   137.   Additionally, these supposed NAV Reports were false and misleading
14   as they merely confirmed the face value (*e.g.*, the amount invested by an investor)
15   of particular assets, as opposed to the actual NAV as of the date or the report.
16   Typically, the term "net asset value" denotes the market value of a particular asset,
17   as of a particular date, minus any liabilities associated with that asset.

18   138.   In most instances, the value of the assets held by the SPVs had
19   significantly declined after the date of the applicable offering.  For instance, the
20   entire market for life insurance assets was severely depressed between 2007 and
21   2008, and yet this was not reflected in the NAV Reports issued by Pang and
22   PEMGroup.  Also, a number of the assets held by, and/or contained in, the SPVs
23   had been misappropriated by Pang and PEMGroup.  However, the resulting
24   diminution in value of the affected SPVs was not reflected in the NAV Reports.

25   *False Claims Regarding Danny Pang's*
26   *Educational Background and Employment History*

27   139.   In soliciting investments in PEMGroup's offerings, Defendants
28   routinely made oral and written statements to investors that Pang attended and

- 31 -

1  obtained a bachelor's degree and an MBA from the University of California,

2  Irvine.  Similarly, Pang falsely represented to investors that he had previously been

3  employed as a senior vice president and senior high-tech merger adviser by the

4  well-known brokerage firm Morgan Stanley & Co.

5          140.    For instance, in October 2006, PEMGroup and Pang gave a power

6  point presentation to representatives of investor Banc Sinopac at PEMGroup's

7  Irvine, California offices.  One of the purposes of this presentation was to solicit

8  Bank Sinopac to invest in an offering by GVEC II Series 2006-A.  At this

9  presentation, Pang stated that he had previously been employed by Morgan Stanley

10 as a vice president, and had received undergraduate degrees in biology and

11 physics, and an MBA from the University of California, Irvine.

12         141.    Additionally, at least as early as February 2003, Defendants made

13 representations on PEMGroup's website that Pang had obtained undergraduate

14 degrees in biology and physics,  as well as an MBA degree, from the University of

15 California, Irvine.  PEMGroup's website also stated that Pang had been employed

16 by Morgan Stanley.

17         142.    In truth, however, Pang had never been an admitted student at the

18 University of California, Irvine and had never received a single undergraduate or

19 graduate degree from the institution.

20         143.    Similarly, Pang had never been employed by Morgan Stanley in any

21 capacity.

22                 ***Defendants Knew Or Were Reckless In Not Knowing***

23                     ***The Falsity Of Their Representations***

24         144.    Pang, and through him each of the Entity Defendants, acted with

25 scienter in committing the violations alleged herein.

26         145.    Pang controlled each of the Entity Defendants' operations and was

27 responsible for the representations made to investors.  Pang directed, and directly

28 made, misrepresentations to investors regarding the manner in which PEMGroup

1  would utilize their funds.  Specifically, Pang directed, and directly made,

2  misrepresentations to investors that their funds would be used to invest in assets

3  related to life insurance and/or timeshare assets.  However, at the time Pang directed,

4  and directly made, such statements to investors, he knew (and failed to disclose to

5  investors) that he and PEMGroup planned to use, and/or were using, investor funds

6  to make interest and principal payments to, and premium payments on behalf of,

7  previous PEMGroup investors that had been placed in failing investments.

8      146.  At the time that Pang directed, and directly made, misrepresentations

9  to investors that their funds would be used to invest in assets related to life

10  insurance and/or timeshare assets, Pang knew (and failed to disclose to investors)

11  that he and PEMGroup planned to use, and/or were using, investor funds to make

12  loans to PEMGroup and unsecured and personal loans to Pang.

13      147.  Pang directed, and directly made, misrepresentations to investors that

14  their investments were insured and guaranteed by insurance coverage.

15  Additionally, Pang directed the forgery of an insurance policy, as well as the

16  distribution of such policy to investors, in order to support the false claims that

17  investments in PEMGroup were insured and guaranteed.

18      148.  In addition, Pang directed the transfer of investor funds for

19  undisclosed and illicit and uses, which include, but are not limited to, loans to

20  PEMGroup to fund its operating expenses and for the purchase of aircraft,

21  unearned commissions, and undisclosed interest-free "loans" to Pang and

22  additional misappropriations of millions of dollars by Pang.

23      149.  Pang knew that the Net Asset Value reports disseminated by

24  PEMGroup were not authentic and false and misleading.  Finally, Pang knows that

25  he does not have the educational degrees he has claimed, and he knows that he was

26  never employed by Morgan Stanley.

27  ///

28  ///

## FIRST CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES

### Violations Of Section 17(a) Of The Securities Act

### (Against All Defendants)

150.  The Commission realleges and incorporates by reference paragraphs 1 through 149 above.

151.  Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

      a.    with scienter, employed devices, schemes, or artifices to defraud;

      b.    obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      c.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

152.  By engaging in the conduct described above, each of Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

### Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Thereunder

### (Against All Defendants)

153.  The Commission realleges and incorporates by reference paragraphs 1

1 | through 149 above.

2 |     154. Defendants, and each of them, by engaging in the conduct described

3 | above, directly or indirectly, in connection with the purchase or sale of a security,

4 | by the use of means or instrumentalities of interstate commerce, of the mails, or of

5 | the facilities of a national securities exchange, with scienter:

6 |     a.   employed devices, schemes, or artifices to defraud;

7 |     b.   made untrue statements of a material fact or omitted to state a

8 |     material fact necessary in order to make the statements made,

9 |     in the light of the circumstances under which they were made,

10 |     not misleading; or

11 |     c.   engaged in acts, practices, or courses of business which

12 |     operated or would operate as a fraud or deceit upon other

13 |     persons.

14 |     155. By engaging in the conduct described above, each of the Defendants

15 | violated, and unless restrained and enjoined will continue to violate, Section 10(b)

16 | of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R.

17 | § 240.10b-5.

18 | **PRAYER FOR RELIEF**

19 | WHEREFORE, the Commission respectfully requests that the Court:

20 | **I.**

21 | Issue findings of fact and conclusions of law that Defendants committed the

22 | alleged violations.

23 | **II.**

24 | Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d),

25 | temporarily, preliminarily and permanently enjoining Defendants and their

26 | officers, agents, servants, employees, and attorneys, and those persons in active

27 | concert or participation with any of them, who receive actual notice of the

28 | judgment by personal service or otherwise, and each of them, from violating

1  Section 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c) & 77q(a), and

2  Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder,

3  17 C.F.R. § 240.10b-5.

### III.

5      Issue, in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order

6  and a preliminary injunction freezing the assets of each of the Defendants, directing

7  the assets of each of the Defendants to be repatriated to the United States, appointing

8  a receiver over the Entity Defendants, requiring accountings from each of the

9  Defendants, prohibiting each of the Defendants from destroying documents, and

10  ordering expedited discovery, and ordering Defendant Pang to relinquish his passport.

### IV.

12      Order each of the Defendants to disgorge all ill-gotten gains from their

13  illegal conduct, together with prejudgment interest thereon.

### V.

15      Order each of the Defendants to pay civil penalties under Section 20(d) of

16  the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act,

17  15 U.S.C. § 78u(d)(3).

### VI.

19      Retain jurisdiction of this action in accordance with the principles of equity

20  and the Federal Rules of Civil Procedure in order to implement and carry out the

21  terms of all orders and decrees that may be entered, or to entertain any suitable

22  application or motion for additional relief within the jurisdiction of this Court.

### VII.

24      Grant such other and further relief as this Court may determine to be just and

25  necessary.

26

27  DATED: August 10, 2009

28

Paris Wynn
Attorney for Plaintiff
Securities and Exchange Commission

- 36 -

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is:

[X]    U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648

Telephone No. (323) 965-4562; Facsimile No. (323) 965-3908.

On August 10, 2009, I caused to be served the document entitled **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** on all the parties to this action addressed as stated on the attached service list:

[ ]    **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

    [ ]    **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

    [ ]    **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ]    **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

[ ]    **FEDERAL EXPRESS:** By placing in sealed envelope(s) designated by Federal Express with delivery fees paid or provided for, which I deposited in a facility regularly maintained by Federal Express or delivered to a Federal Express courier, at Los Angeles, California.

[X]    **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

[ ]    **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

[X]    **(Federal)** I declare under penalty of perjury that I am a member of the bar of this Court and that the foregoing is true and correct.

Date: <u>August 10, 2009</u>

Paris A. Wynn

- 37 -

1

<u>SEC v. PRIVATE EQUITY MANAGEMENT GROUP, INC., et al.</u>
<u>United States District Court – Central District of California</u>
Case No. CV 09-2901 PSG (Ex)
(LA-3651)

2

3

4

<u>SERVICE LIST</u>

5

6

David J. Schindler, Esq.
Latham & Watkins
355 South Grand Avenue
Los Angeles, CA 90071-1560
Email: david.schindler@lw.com
*Counsel to Defendant Danny Pang*

7

8

9

Nicolas Morgan, Esq.
DLA Piper US LLP
1999 Avenue of the Stars, Suite 400
Los Angeles, CA 90067-6023
Email: nicolas.morgan@dlapiper.com
*Counsel to Temporary Receiver Robert P. Mosier*

10

11

12

13

James J. Moloney, Esq.
Gibson, Dunn & Crutcher
3161 Michelson Drive
Irvine, California 92612-4412
Email: jmoloney@gibsondunn.com
*Counsel to Defendants Private Equity Management Group, Inc. and
Private Equity Management Group, LLC*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28